Lipstok, Appellant, *v.* Haddock Mining Company.

Argued December 11, 1934.

Be-fore TREXLER, P. J., KELLER, CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and JAMES, JJ.

*Roger J. Dever*, for appellant.

*Wm. A. Skinner*, for appellee.

OPINION BY STADTFELD, J., April 15, 1935:

The claimant in this case, William Lipstok, some short time prior to May 11, 1929, fell while going down a slope injuring his leg. He returned to work following the accident without any apparent disability except a slight limp, and continued to work up to May 11, 1929, when he was squeezed between a mule and a concrete wall. He filed a claim for compensation for the accident of May 11, 1929, and, after due hearing, the referee made an award in his favor, which award was affirmed by the Workmen's Compensation Board, upon appeal. The defendant then appealed to the court of common pleas of Schuylkill County, which court returned the record for more specific findings of fact. The Workmen's Compensation Board then proceeded as directed by the court and found the facts. The defendant again filed exceptions which were overruled by the Board. The record was then returned to the Court of Common Pleas of Schuylkill County for further disposition. The court thereupon reversed the award of the Workmen's Compensation Board and directed judgment be entered for the defendant. From that decision claimant took this appeal.

In the last findings of fact by the Board, which are the only ones necessary for consideration, the Board found that the claimant was squeezed on May 11, 1929, sustaining multiple abrasions to the hip, lower abdomen, back and left leg, and abrasions to the left hand.

It found specifically that he did not sustain any fracture of the vertebrae or any sacro-iliac sprain or misalignment of the symphysis pubis or lesion of the spinal cord.  It found that the claimant is totally disabled because of acute hypertrophic osteoarthritis of the lumbar vertebrae, which is the primary cause of his disability, although he is also suffering from some paresis caused by arteriosclerosis and endarteritis, which conditions have no connection with any accident but do contribute to claimant's total disability.  It found that the squeeze aggravated and accelerated the existing arthritis and thus contributed to total disability; that the aggravation of the arthritis caused by the accident, entirely apart from the natural progress of the disease, resulted in a permanent loss of earning power of 50% and that all other loss of earning power is caused solely by the natural progress of the arthritis and by arteriosclerosis and endarteritis.

The main controversy turns upon the question whether claimant's disability resulted from the accident or from the natural development and progress of certain pre-existing chronic diseases.

The claimant testified, on his own behalf, as follows: "A. The mule was going across the slope and with concrete walls and the mule squeezed me against the concrete wall.  If it was half a minute more I would die.  The driver came and hollered and I fell down between the mule and the car, on the spreader.  The box caught me on the leg.  When I was on the bottom the car scraped my left leg and my hands too."  He saw Dr. Conrad in Port Carbon on May 17, who treated him for his hand; he made no complaint to him about his leg or back because, as he states, "I thought it would be all right and didn't tell him nothing.  I am all stiff."

William Lipstok, a son of claimant, who worked

with his father as a laborer on the day of the accident, corroborated him as to the happening of an accident on the day in question, but his statement as to the nature of the accident is simply what he was informed, by the driver, and is, of course, not competent.

Dr. A. M. Miller, on behalf of claimant, testified that he first saw claimant on June 17. A part of his testimony is as follows: ''A. Upon examination medically I found multiple abrasions across the lower abdomen and also across the back along the hip and on the left leg. I found the man had a limp, was weak; couldn't stand very well on that left side and complained of pain on the left side posteriorly. Q. Have him X-rayed, doctor? A. I had. Q. What did the X-ray disclose? A. I will read the report from the roentgenologist: 'Antero-posterior view of the lumbar spine and pelvis shows sharpening of the tip of the vertebra and spicula formation of the third and fourth lumbar vertebrae, with apparent proliferation of the lower left tip of the third lumbar vertebra and the upper left tip of the fourth lumbar vertebra, producing a partial fusion. The first and second lumbar vertebrae on the left of the median line appear to have undergone an erosive process which has healed in. The symphysis pubis is slightly out of alignment on the left and may be due to a moderate sacroiliac sprain.'

''That is the roentgenologist's report. Q. Who was the roentgenologist? A. Edgar S. Mattison, at the Warne hospital '...... Q. What is his condition today, doctor; able to work? A. Not able to work at the present time; I don't think he will ever be able to work. Q. Get a history of being squeezed with a mule? A. Yes, sir. Q. What was the history? A. I asked him how it happened and he said he went out to the gangway to assist a driver and a mule squeezed him against a cement abutment and he fell down alongside

of the car and the trip of cars started out and he was dragged along some distance, thirty or forty feet, he claims, and his left leg was dragged along somewhere by some part of the car. Q. You heard him testify on the stand? A. Yes. Q. Was that substantially what he told you? A. Just the same thing. Q. Doctor, in your opinion is the condition this man is in from that accident? A. Yes; I asked the man if he had been ill prior to this or have any complaint and he said 'no'; I asked him if he had ever been sick or any chronic condition. He said 'no.' I had his kidneys examined and the urinalysis is negative, on the 11th of July, 1929. Q. After having done all you could do to locate his trouble, what conclusion did you come to? A. I believe the man is truthful. Q. Is it your opinion the injury is causing his present condition? A. Yes; there is nothing revealed it wasn't so. Q. Nothing else can be located responsible for his condition except his injury? A. His injury. ...... Q. This bone condition as shown by the X-ray do you think that condition was caused by this accident of May 11th? A. To make sure of that I had an urinalysis done and showed no chronic interstitial nephritis which may at the time have anything to do with the spine or spicula formation and the urinalysis is negative and that excludes any chronic disease outside of that. ...... Q. What is his complaint now? A. Complained of pain of the left leg; the man is weak and unable to have any power in that left leg at all. Q. What causes that? A. I think that symphysis pubis in the sacro-iliac junction being out of alignment would do that.''

Dr. Ross H. Thompson, a specialist in neurology and psychology, who was called in and examined claimant at the instance of the referee, testified that the claimant had two injuries to his spinal cord, which he attributed to the accident of May 11. These two injuries, one in the upper part of the spinal cord, and

the other in the upper part of the brain, according to Dr. Thompson, resulted in a spastic paresis of the right arm, trunk and leg, and a paresis of the left face, palate and uvula and tongue, with inability to feel pain, temperature or touch on the left side of the body from the level of the sixth spinal segment to the tip of his toes. On cross-examination, the doctor said he could not tell whether or not the condition resulted from the fall down the slope, which occurred prior to May 11, and he said if the claimant had pain in the leg before May 11, it might have been caused by arthritis. He said the claimant likely has arthritis.

Dr. R. D. Spencer, called by the referee as an impartial physician, testified that he had examined the record in this case and based his opinion thereon, not having seen the claimant. He believed the condition of claimant was due to the arthritis being aggravated by the injury sustained on May 11, basing his conclusion on the fact that the symptoms became worse after the accident. He further stated that, if following his fall down the slope, the claimant pursued his ordinary work, with help, and was squeezed by this car, and unable to do it since, the squeezing accident would aggravate the hypertrophic arthritis. He was unable, however, to state what percentage of his disability was due to the hypertrophic arthritis. He did state however that "possibly the same condition would have resulted in six months time from the natural progress of the disease."

There was countervailing testimony ex parte defendant, that the disease from which claimant was suffering was not in any way caused or aggravated by the injury.

The Board evidently gave weight to portions of the medical testimony presented by either side, and based its conclusions thereon. It is impossible to reconcile the medical testimony, and we are not surprised at the

difficulty which confronted the Board. Upon a careful examination of the testimony, we can not say that there is not sufficient legally competent testimony to support the conclusion that the injury aggravated an existing hypertrophic arthritis.

This court is not a fact finding body. As stated in Rodman v. Smedley, 276 Pa. 296, 120 A. 266, "Although the Act of June 26, 1919, P. L. 642, brings the evidence before us for review in this class of cases, our revisory powers are limited to a determination of the question whether there is evidence to support the findings, and whether the law has been properly applied to them (Roach v. Oswald Lever Co., 274 Pa. 139; Callihan v. Montgomery, 272 Pa. 56; Strohl v. Eastern Pa. Rys. Co., 270 Pa. 132; Kuca v. Lehigh Valley Coal Co., 268 Pa. 163) and does not enable us to weigh conflicting evidence or decide what inferences should be drawn therefrom." To same effect, Howell v. Kingston Twp., 106 Pa. Superior Ct. 89, 161 A. 559; Altman v. Kaufmann Realty Co., 110 Pa. Superior Ct. 178, 167 A. 394.

We find nothing however in the testimony of any of the witnesses as to the percentage of disability occasioned as a result of the accident, to support the finding of the Board that the aggravation caused by the accident of May 11, 1929, apart from the natural progress of the disease, resulted in a permanent diminution or loss of earning power of fifty per cent.

As stated in Bittner v. Saltlick Township, 109 Pa. Superior Ct. 406, 167 A. 483, on p. 411: "In such cases the burden is upon the claimant to show that his existing diseases were aggravated to such an extent that the aggravation became the independent cause of the disability for which he claims compensation. In other words, the only compensable disability is that shown by the claimant to have resulted from the accident, as distinguished from the disability resulting from the

natural progress and development of any diseases with which he may be afflicted and for which the employer is in no way liable.''

We have concluded that the interests of justice will be best served by affording claimant an opportunity to show what, if any, disability resulted from the accident, as distinguished from the disability attributable to the natural progress of the diseases from which claimant was suffering when it occurred, together with the right to the employer to present additional evidence upon the issues indicated.

The judgment is reversed and the record remitted to the court below to the end that it may be returned to the Board for further proceedings not inconsistent with this opinion.